# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND

LAW OFFICE OF YURIY PRAKHIN, P.C.,
and Yuriy Prakhin, Esq.,

                               *Plaintiffs*,

    -*against*-

FARUQI & FARUQI, LLP, Innessa Melamed Huot,
Camilo M. Burr, Alex Hartzband,
TILTON BELDNER LLP, and Joshua Beldner,

                               *Defendants*.

Index No.
Date Purchased:

**SUMMONS**

Plaintiff designates Richmond
County as the place of trial.

The basis of venue is:
Plaintiff's residence.
Plaintiff resides at
55 Arbor Court
Staten Island, New York

**To the above-named Defendants:**

    **YOU ARE HEREBY SUMMONED** to answer the complaint in this action, and to serve

a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of

appearance on the Plaintiffs' attorney within twenty days after the service of this summons,

exclusive of the day of service, where service is made by delivery upon you personally within the

state, or within 30 days after completion of service where service is made in any other manner.  In

case of your failure to appear or answer, judgment will be taken against you by default for the

relief demanded in the complaint.

Dated:      Brooklyn, New York
            October 7, 2025

                                     YURIY PRAKHIN, ESQ.
                                     LAW OFFICE OF YURIY PRAKHIN, PC
                                     1883 86th Street, 2nd Floor
                                     Brooklyn, New York 11214
                                     (718) 946-5099

Case 1:25-cv-05911-CBA-SDE Document 1-1 Filed 10/08/25 Page 3 of 39 PageID #: 80

To: FARUQI & FARUQI, LLP
685 Third Avenue, 26th floor
New York, New York 10017

Innessa Melamed Huot
c/o FARUQI & FARUQI, LLP
685 Third Avenue, 26th floor
New York, New York 10017

Camilo M. Burr
c/o FARUQI & FARUQI, LLP
685 Third Avenue, 26th floor
New York, New York 10017

Alex Hartzband
c/o GRUBIN LAW GROUP, P.C.
1270 Avenue of the Americas Fl 7
NEW YORK, New York 10020

TILTON BELDNER LLP
626 RXR Plaza
Uniondale, New York 11556

Joshua Beldner
c/o TILTON BELDNER LLP
626 RXR Plaza
Uniondale, New York 11556

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND
_____

LAW OFFICE OF YURIY PRAKHIN, P.C.,
and Yuriy Prakhin, Esq.,                                Index No.

                                        *Plaintiffs*,      **VERIFIED COMPLAINT**

            -*against*-

FARUQI & FARUQI, LLP, Innessa Melamed Huot,
Camilo M. Burr, Alex Hartzband,
TILTON BELDNER LLP, and Joshua Beldner,

                                        *Defendants*.
_____

Plaintiffs LAW OFFICE OF YURIY PRAKHIN, P.C. and Yuriy Prakhin, Esq. allege as

follows for their Complaint against the above-named Defendants:

**THE PARTIES**

1.      Plaintiff Law Office of Yuriy Prakhin, P.C. ("PRAKHIN, P.C.") is a law firm

organized as a professional corporation under New York law.

2.      Plaintiff Yuriy Prakhin ("PRAKHIN") is a resident of the State of New York.

3.      At all times relevant, Defendant FARUQI & FARUQI, LLP ("FARUQI &

FARUQI") was a law firm organized as a limited liability partnership under New York law.

4.      At all times relevant, Defendant TILTON BELDNER LLP ("TILTON

BELDNER") was a law firm organized as a limited liability partnership under New York law.

5.      Defendant Innessa Melamed Huot ("HUOT") is a resident of the State of New York.

6.      At all times relevant to this lawsuit, HUOT was an attorney admitted to practice

law in the State of New York.

7.      At all times relevant to this lawsuit, HUOT was an attorney admitted to practice

law in the US District Court, Eastern District of New York.

8.      At all times relevant to this lawsuit, HUOT was an attorney with Faruqi & Faruqi, LLP.

9.      Defendant Camilo M. Burr ("BURR") is a resident of the State of New York

10.     At all times relevant to this lawsuit, BURR was an attorney admitted to practice law in the State of New York.

11.     At all times relevant to this lawsuit, BURR was an attorney admitted to practice law in the US District Court, Eastern District of New York.

12.     At all times relevant to this lawsuit, BURR was an attorney with Faruqi & Faruqi, LLP.

13.     Defendant Alex Hartzband ("HARTZBAND") is a resident of the State of New York.

14.     At all times relevant to this lawsuit, HARTZBAND was an attorney admitted to practice law in the State of New York.

15.     At all times relevant to this lawsuit, HARTZBAND was an attorney admitted to practice law in the US District Court, Eastern District of New York.

16.     At all times relevant to this lawsuit, HARTZBAND was an attorney with Faruqi & Faruqi, LLP.

17.     Defendant Joshua Beldner ("BELDNER") is a resident of the State of New York.

18.     At all times relevant to this lawsuit, BELDNER was an attorney admitted to practice law in the State of New York.

19.     At all times relevant to this lawsuit, BELDNER was an attorney admitted to practice law in the US District Court, Eastern District of New York.

2

20.     At all times relevant to this lawsuit, BELDNER was an attorney with TILTON BELDNER.

21.     On May 20, 2019, Yelena Ruderman ("RUDERMAN") commenced a lawsuit (hereinafter the "RUDERMAN LAWSUIT") in the US District Court for the Eastern District of New York, against PRAKHIN and PRAKHIN P.C. (collectively "the PRAKHIN Defendants"), asserting claims for alleged violations of the Americans with Disabilities Act, as well as New York State and New York City Human Rights Laws, central to which was a claim that RUDERMAN was disabled, and that PRAKHIN P.C. failed to make reasonable accommodations.

22.     FARUQI & FARUQI represented RUDERMAN in the prosecution of the RUDERMAN LAWSUIT.

23.     HUOT represented RUDERMAN in the prosecution of the RUDERMAN LAWSUIT.

24.     HUOT represented RUDERMAN in the prosecution of the RUDERMAN LAWSUIT in the scope of their employment by FARUQI & FARUQI.

25.     BURR represented RUDERMAN in the prosecution of the RUDERMAN LAWSUIT.

26.     BURR represented RUDERMAN in the prosecution of the RUDERMAN LAWSUIT in the scope of their employment by FARUQI & FARUQI.

27.     HARTZBAND represented RUDERMAN in the prosecution of the RUDERMAN LAWSUIT.

28.     HARTZBAND represented RUDERMAN in the prosecution of the RUDERMAN LAWSUIT in the scope of their employment by FARUQI & FARUQI.

3

29.     TILTON BELDNER represented RUDERMAN in the prosecution of the RUDERMAN LAWSUIT.

30.     BELDNER represented RUDERMAN in the prosecution of the RUDERMAN LAWSUIT.

31.     BELDNER represented RUDERMAN in the prosecution of the RUDERMAN LAWSUIT in the scope of their employment by TILTON BELDNER.

## BRIEF BACKGROUND

32.     PRAKHIN P.C. is a small, plaintiff-side personal injury and medical malpractice law firm located at 1883 86th Street, in Brooklyn, New York.

33.     PRAKHIN founded PRAKHIN P.C. in 2002 and is the firm's president.

34.     PRAKHIN and his firm's practice focuses on personal injury cases, including car accidents, trip and fall cases, workplace accidents, and medical malpractice.

35.     At all times herein relevant PRAKHIN P.C. employed approximately twenty (20) individuals, including attorneys, paralegals, and office staff.

36.     PRAKHIN P.C. has always been an equal opportunity employer and has never discriminated against any applicant or employee on the basis of any protected category, including disability, as defined under applicable federal, state, or local law.

37.     In September 2012, PRAKHIN P.C. hired RUDERMAN as a paralegal.

38.     At the time, RUDERMAN's admission to the New York State Bar was pending.

39.     Upon her admission to the bar, RUDERMAN was promoted to a full-time associate attorney position with the firm.

40.     All full-time attorneys at the firm, including RUDERMAN, are expected to work 40 hours a week and are assigned a full caseload of between 100 and 200 cases at a time.

4

41.     RUDERMAN's job duties as an associate attorney included investigating and developing evidence to support clients' claims, attending court conferences, litigating motions, and conducting depositions, as well as utilizing the firm's case management system, SAGA.

42.     It is also an essential responsibility of all attorneys to proactively settle cases to which they are assigned, on terms favorable to PRAKHIN P.C.'s clients.

43.     RUDERMAN resigned her position at PRAKHIN P.C. in February of 2017 in order to go to work at another law firm.

44.     RUDERMAN returned to work as a full-time associate for PRAKHIN P.C. on June 18, 2018.

45.     RUDERMAN was re-hired by PRAKHIN P.C. at this time, based upon RUDERMAN's representation, at a meeting with PRAKHIN in May 2018, that, at the firm where she had been employed in the interim, she had gained significant additional experience, which included conducting trials, and case management.

46.     Based upon her representations regarding her interim work experience, RUDERMAN was assigned her own caseload to manage independently at PRAKHIN P.C..

47.     The essential functions of RUDERMAN's attorney position at PRAKHIN P.C. in 2018 included going to court on motions and conferences, representing clients in defending and prosecuting depositions (which necessitated her being able to clearly see all exhibits at the deposition), performing legal research, and reviewing all necessary documents.

48.     The essential functions of RUDERMAN's attorney position at PRAKHIN P.C. in 2018 included reviewing literally hundreds of pages of documents including emails, daily, including, for example, medical records, both printed and handwritten with various acronyms and abbreviations, accident-related color videos and color photographs of things like defects on a

property, a sidewalk, accident scenes, etc., and documents such as leases and other contracts which can often be of poor quality.

49.    The number of the pages an attorney, including RUDERMAN, was required to read while performing these essential functions at PRAKHIN P.C. at this time was well above 100 pages, and upwards to 300 pages daily.

50.    Shortly after RUDERMAN resumed her second employment with PRAKHIN, P.C. between late June and August of 2018, PRAKHIN discovered that RUDERMAN was not competently performing the essential responsibilities of her position as a full-time associate attorney, specifically: she was not effectively managing her caseload, did not proactively settle cases, and was failing to enter case notes into SAGA (the firm's case management software system).  PRAKHIN also discovered that she often used her cell phone for personal calls during work hours, against firm policy.

## RUDERMAN'S INABILITY TO PERFORM THE ESSENTIAL FUNCTIONS OF HER POSITION DUE TO VISION LOSS

51.    In early October 2018, RUDERMAN advised PRAKHIN that she was experiencing blurry vision, for which she had to take days off from work to attend doctor's appointments.

52.    RUDERMAN ultimately was absent from work on October 4, 5, 8, 9, 10, 11, 12, 15, 16, 18, and 19, as well as November 5, 9, 15, 16, 19, 20, 21, 23, 26, 27, and 30, of 2018.

53.    PRAKHIN P.C.'s Employee Handbook, terms of which RUDERMAN agreed to, required medical documentation for any such requests for time off.

54.    RUDERMAN did not provide any such documentation.

55.    Despite the lack of the required medical documentation, PRAKHIN granted RUDERMAN's requests for this time off.

6

56.    In October or November 2018, PRAKHIN requested medical documentation for RUDERMAN's absences from work.

57.    RUDERMAN still did not provide any such medical documentation.

58.    In October, 2018, RUDERMAN was diagnosed with Leber Hereditary Optic Neuropathy (LHON), a condition which causes severe vision impairment and for which there is no known cure.

59.    RUDERMAN did not share her LHON diagnosis with PRAKHIN, P.C. or PRAKHIN, at this time stating only that she had experienced blurry vision.

60.    Despite lack of notice of her condition, i.e. the extent of (the true nature of) her disability, PRAKHIN, P.C. nevertheless sought to accommodate RUDERMAN's complaints permitting the use of special computer software to assist her.

61.    Despite these accommodations (the special software and the time off permitted to seek medical intervention), as of December 2018, RUDERMAN was still not performing the essential responsibilities of her position as a full-time associate attorney.

62.    In addition to the inadequacy of performance noticed previously, as of December 2018, RUDERMAN was notably discovered to have also been complained of as rude, unprofessional, and otherwise non-responsive by clients.

63.    In December 2018, RUDERMAN finally disclosed her LHON diagnosis to PRAKHIN, but insisted that she would be able to continue her work at PRAKHIN, P.C. with accommodations such as a full-page magnifier, a magnifying glass, OrCam glasses, and two forms of dictation software.

7

64.     At no time however did RUDERMAN provide PRAKHIN, P.C. any medical documentation identifying any accommodation that would actually enable her to perform the essential functions of her job as a full-time associate at PRAKHIN, P.C.

65.     PRAKHIN discussed with RUDERMAN the availability of a disability leave of absence as an accommodation, but she responded that she did not want to take a disability leave of absence because she was "not disabled."

66.     In December 2018, RUDERMAN had proven herself unable to perform the essential functions of a full-time associate attorney, and also continuously violated firm policy regarding cell phone use, a policy which PRAKHIN reminded all employees, including RUDERMAN, during this time, who acknowledged receipt of the warning.

67.     As a result of RUDERMAN's failure to perform the responsibilities of her position as an associate over an extended period of time, PRAKHIN made the decision to terminate her employment.

68.     On December 14, 2018, PRAKHIN advised RUDERMAN that her employment was being terminated as a result of her failure to perform her job responsibilities.

69.     Between June and December of 2018, while RUDERMAN was employed at PRAKHIN P.C. as an associate attorney, she suffered a dramatic loss of vision in her only useful eye due to LHON; at this time, she only had functional vision in the right eye due to longstanding and dense amblyopia of the left eye.

70.     RUDERMAN's visual acuity eventually stabilized at 20/250 in her better eye by the end of November, 2018, beyond the level of legal blindness (the Social Security Administration considers a person "legally blind" if the best-corrected central visual acuity is 20/200 or worse in the *better* eye *or* the visual field in the better eye is 20 degrees or less).

8

Case 1:25-cv-05911-CBA-SDE    Document 1-1    Filed 10/08/25    Page 12 of 39 PageID
#: 20
RECEIVED NYSCEF: 10/07/2025

71.    LHON is an inherited visual disorder that causes progressive vision loss in young adults.  It is a rare mitochondrial disorder causing sequential visual loss due to optic nerve degeneration. LHON typically initiates painlessly in one eye, progressing to the second eye within a year, leading to profound visual impairment, color vision deficits, and central scotomas. It typically begins as a painless loss centrally in one eye and the second eye is affected within one year. Most patients deteriorate to acuities worse than 20/200. Color vision is affected severely, often early in the course, but rarely before the significant visual loss.  The central visual field loss may be relative during the early stages of vision loss but rapidly become large and absolute, measuring at least 25 degrees to 30 degrees in diameter.

72.    During RUDERMAN's employment at PRAKHIN P.C. and in the period of her failing vision, many accommodations and/or assistive devices were given to help her to continue her work. Devices to enlarge print or to convert text to speech were trialed such as computer programs, cellphone applications, various magnifiers, and the OrCam MyEye glasses.

73.    None of these devices have the ability to actually correct any visual defect in central, peripheral, color, or other areas of vision and are only designed to "enhance" remaining vision or to use auditory means of "reading" rather than vision.   Indeed, none of the accommodations were found to be effective in helping RUDERMAN complete her job duties in a reasonable amount of time, or in discerning valuable information such as from a low-contrast video clip or handwritten materials.

74.    Even with these vision aids, she could not review necessary materials in a timely manner to perform the essential functions of her job in PRAKHIN office.

75.     Even in cases where magnifying devices could allow for some level of reading, the reading speed would be negatively affected making a visually-demanding work load impossible to complete during a normal 8 or 9-hour work day.

76.     Low-vision devices assist text access but do not restore central acuity or color discrimination. Despite trials of multiple aids (full-page magnifier, OrCam, dictation software), Plaintiff remained unable to timely review handwritten records and low-contrast imagery—tasks essential to her job. Defendants' contrary representations would have eliminated essential functions rather than accommodated them.

77.     RUDERMAN'S own medical testing reflected significant color-vision impairment, specifically that her color perception was rated at 6/10.

78.     This color perception impairment could have led to misidentification of critical visual elements in photo or video exhibits—such as the color of a traffic light—which could be fatal to such a case.  Defendants knew of these deficits.  Nonetheless, Defendants elicited and argued testimony suggesting reliable perception of color-critical evidence (e.g., the color of traffic signals in video/photographic exhibits).  In so doing, Defendants presented misleading evidence intended to deceive the Court and jury about Plaintiff's ability to perform essential visual-analysis functions of her job.

79.     There are no recognized accommodations for LHON that would mitigate her visual or color perception deficiencies in the context of her job responsibilities.

80.     In and around September 2018, RUDERMAN developed severe vision loss, and within a two-month period, she was legally blind due to LHON with a paracentral scotoma impacting her central vision.

10

FILED: RICHMOND COUNTY CLERK 10/07/2025 03:15 PM
NYSCEF DOC. NO. 1

Case 1:25-cv-05911-CBA-SDE    Document 1-1    Filed 10/06/25    Page 14 of 39 PageID
#: 92

INDEX NO. 152459/2025
RECEIVED NYSCEF: 10/07/2025

81.    The effect of a central scotoma (blind spot) of 25-30 degrees would be approximately the loss of the area when holding an outstretched open hand in front of one's face when fixation is held at the center of the hand, without moving the eyes, and using only the vision outside of the side of the hand, and trying to use this vision to read a page or computer screen. Significantly enlarging the print may be helpful to a degree, but the ability to quickly scan visual material is lost.  This type of vision loss does not affect one's ability to walk and move around but it severely impairs one's ability to see detail, read small or medium print, see details in videos, see low contrast items, decipher handwritten materials, and perform other visually-demanding, central vision tasks.

82.    Because of this, due to the significant loss of vision in her only useful eye due to the onset of LHON, RUDERMAN was not able to perform the essential functions of her job in PRAKHIN office, with or without accommodations.  When her vision declined in her right eye within just a few months, she would have required a minimum of 2.11 more time to complete the required daily reading tasks of her position, and more likely than not, even significantly more time as her vision continued to decline to 20/250 due to LHON.

83.    During the litigation of this action and at trial of this action, Plaintiff herein will prove, with scientific evidence, experts, as well as RUDERMAN's medical records and testimony of her doctors, that RUDERMAN was unable to perform the essential duties of her position at PRAKHIN P.C.

**THE RUDERMAN LAWSUIT**

84.    In the discovery phase of the RUDERMAN LAWSUIT, RUDERMAN certified that she provided all responsive documents relating to her medical condition, disability and emotional injury claims.

11

85.     However, RUDERMAN failed to actually obtain or exchange all of the documents that she certified she had.  Material evidence was withheld by RUDERMAN and her attorneys (Defendants).

86.     FARUQI & FARUQI knew and intended to deceive the Court and Plaintiffs (or at minimum acted with willful blindness) that required discovery was incomplete, and that RUDERMAN's certification was false.

87.     FARUQI & FARUQI withheld material evidence from the PRAKHIN Defendants and the Court.

88.     HUOT knew and intended to deceive the Court and Plaintiffs (or at minimum acted with willful blindness) that required discovery was incomplete, and that RUDERMAN's certification was false.

89.     HUOT withheld material evidence from the PRAKHIN Defendants and the Court.

90.     BURR knew and intended to deceive the Court and Plaintiffs (or at minimum acted with willful blindness) that required discovery was incomplete, and that RUDERMAN's certification was false.

91.     BURR withheld material evidence from the PRAKHIN Defendants and the Court.

92.     HARTSBAND knew and intended to deceive the Court and Plaintiffs (or at minimum acted with willful blindness) that required discovery was incomplete, and that RUDERMAN's certification was false.

93.     HARTSBAND withheld material evidence from the PRAKHIN Defendants and the Court.

94.     TILTON BELDNER knew and intended to deceive the Court and Plaintiffs (or at minimum acted with willful blindness) that required discovery was incomplete, and that RUDERMAN's certification was false.

95.     TILTON BELDNER withheld material evidence from the PRAKHIN Defendants and the Court.

96.     BELDNER knew and intended to deceive the Court and Plaintiffs (or at minimum acted with willful blindness) that required discovery was incomplete, and that RUDERMAN's certification was false.

97.     BELDNER withheld material evidence from the PRAKHIN Defendants and the Court.

98.     In preparation for and in furtherance of the prosecution of the RUDERMAN LAWSUIT, for the sole purpose of monetary gain and advantage, RUDERMAN obtained and utilized PRAKHIN, P.C. client files containing confidential client information, without the knowledge, permission, consent or authorization of the clients or PRAKHIN.

99.     In preparation for and in furtherance of the prosecution of the RUDERMAN LAWSUIT, for the sole purpose of monetary gain and advantage, FARUQI & FARUQI obtained and utilized PRAKHIN, P.C. client files containing confidential client information, without the knowledge, permission, consent or authorization of the clients or PRAKHIN.

100.    In preparation for and in furtherance of the prosecution of the RUDERMAN LAWSUIT, for the sole purpose of monetary gain and advantage, HUOT obtained and utilized PRAKHIN, P.C. client files containing confidential client information, without the knowledge, permission, consent or authorization of the clients or PRAKHIN.

13

Case 1:25-cv-05911-CBA-SDE    Document 9-1    Filed 10/08/25    Page 17 of 39 PageID #: 98

101.    In preparation for and in furtherance of the prosecution of the RUDERMAN LAWSUIT, for the sole purpose of monetary gain and advantage, BURR obtained and utilized PRAKHIN, P.C. client files containing confidential client information, without the knowledge, permission, consent or authorization of the clients or PRAKHIN.

102.    In preparation for and in furtherance of the prosecution of the RUDERMAN LAWSUIT, for the sole purpose of monetary gain and advantage, HARTSBAND obtained and utilized PRAKHIN, P.C. client files containing confidential client information, without the knowledge, permission, consent or authorization of the clients or PRAKHIN.

103.    In preparation for and in furtherance of the prosecution of the RUDERMAN LAWSUIT, for the sole purpose of monetary gain and advantage, TILTON BELDNER obtained and utilized PRAKHIN, P.C. client files containing confidential client information, without the knowledge, permission, consent or authorization of the clients or PRAKHIN.

104.    In preparation for and in furtherance of the prosecution of the RUDERMAN LAWSUIT, for the sole purpose of monetary gain and advantage, BELDNER obtained and utilized PRAKHIN, P.C. client files containing confidential client information, without the knowledge, permission, consent or authorization of the clients or PRAKHIN.

105.    New York Judiciary Law § 487 (1) provides, *inter alia*, that an attorney who is "guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party… forfeits to the party injured treble damages, to be recovered in a civil action."

106.    In order to qualify as "any deceit" or "consent[] to any deceit" under Judiciary Law § 487, the misrepresentation or material omission in court proceedings need only be deemed an "egregious act" and need not be a pattern of repeated acts or omissions.

14

107. The acts and omissions complained of herein each independently qualify as an egregious act, deceit, and consent to deceit and in turn a violation of Judiciary Law § 487.

108. Defendants further consented to the deceit of the plaintiff RUDERMAN in their presentation of Plaintiff's deposition testimony, which they knew or should have known was likely to be presented, and which they knew or should have known was false.

109. At RUDERMAN's deposition, she could not see exhibits. Her testimony that she forgot her assistive (reading) device was untruthful, because, being an experienced litigation attorney, she knew that she would need to read documents during her deposition.

110. Defendants knew that this testimony was false.

111. Defendants further consented to the deceit of the plaintiff RUDERMAN in their presentation of testimony and other evidence at trial which they knew was false and which they knew was going to be provided.

112. At trial, RUDERMAN testified about her ability to perform, at the time of trial in 2023, her job as a defense lawyer for American Transit Insurance Company, as a means toward attempting to prove that she was capable of performing the essential functions of her position at PRAKHIN P.C., in 2018. In order to prove that point, it was necessary to establish that the essential functions of the respective positions were the same.

113. On cross-examination at trial, RUDERMAN was asked if she goes to court (as traveling for frequent depositions and court appearances were essential functions of her job at the time of her termination in 2018), and while ultimately admitting she works from home and *never* goes to court, she initially testified, falsely and misleadingly, that it is "not often" that she goes to court.

Case 1:25-cv-05911-CBA-SDE    Document 1-1    Filed 10/06/25    Page 19 of 39 PageID #: 26

114.    Defendants knowingly intended to elicit and advance this testimony to create a false equivalence between the PRAKHIN position (with frequent court/deposition obligations) and RUDERMAN's non-appearance-based ATIC (American Transit Insurance Company) role, thereby misleading the Court and Plaintiffs herein, as to "essential functions" and causing prejudice. Defendants knew and intended to deceive the Court and Plaintiffs (or, at minimum, acted with willful blindness).

115.    RUDERMAN's treating psychiatrist Dr. Anna Shostak reported in her February 5, 2019 note, that RUDERMAN "need[ed] assistance in everyday activity [including to] walk in a room [that] she needs somebody to go with her outside... on a daily basis for all of her activities, she needed assistance."

116.    RUDERMAN obtained Dr. Shostak"s records but RUDERMAN's trial counsel admitted during trial that, while she actually had the record herself, only a small portion of the record that she herself deemed to be relevant was provided.

117.    For the first time, immediately before Dr. Shostak testified, the doctor provided roughly 100 additional mostly hand-written records.  The Defense Counsel had barely 45 minutes to review these records before being compelled to examine the doctor.

118.    Defendants knowingly intended to delay production of these materials until trial, which intentionally prejudiced the defense.

119.    When Dr. Shostak's complete record was produced at trial, it showed that Dr. Shostak had been treating Plaintiff for anxiety and depression since 2008, a full decade before her termination.

120.    The records also reflected that, when Plaintiff first went to Dr. Shostak for psychiatric treatment in 2008, Plaintiff was at that time already being medicated for depression and anxiety by a prior treating psychiatrist.

121.    RUDERMAN had been the first witness to testify in the trial.  Before she had any reason to think that Defendants would have the opportunity to see Dr. Shostak's complete file, RUDERMAN testified that she had not seen her psychiatrist, Dr. Shostak, prior to her termination, thereby representing that all of her psychiatric problems (other than ADD) i.e. anxiety and depression arose after her termination.

122.    Defendants herein knowingly intended to deceive the court and the Plaintiffs, knew this testimony was likely to be presented, and they knew same to be false and misleading.

123.    RUDERMAN disclosed to the PRAKHIN Defendants only a two-page report from her psychotherapist, Dr. Martin Falk, having certified that she had requested and provided all of his records. This certification was entirely false.

124.    Dr. Falk revealed at trial that Plaintiff never actually requested a copy of his records but rather asked him to write a report, which he did.

125.    The PRAKHIN Defendants thus did not obtain Dr. Falk's records until only a few days before trial, and did not know its full contents until during the trial itself as the records were largely just scribbles in a date book.

126.    These records showed that RUDERMAN even lied to Dr. Falk, who she began seeing in August 2019, whereas she told him that her emotional/psychological problems began in fall 2018 and that she had no pre-existing psychiatric issues.  This statement was intentionally false and made solely for the purpose of fabricating a medical record solely for the purpose of litigation.

17

Case 1:25-cv-05911-CBA-SDE    Document 1-1    Filed 10/08/25    Page 21 of 39 PageID #: 28

127.    Not only was this false but Dr. Falk could not even be cross-examined about his client lying to her since he had already testified before Dr. Shostak's complete record was seen.

128.    Dr. Shostak and Dr. Falk both diagnosed Plaintiff with ADD/ADHD, which causes extreme lack of focus and disorganization.

129.    Dr. Shostak testified that anxiety and depression exacerbate the symptoms of ADD, and that when such conditions worsen, such as when she began to suffer blurry vision, it would be even more important to treat the exacerbated conditions

130.    RUDERMAN's condition, and the PRAKHIN Defendants' response to her inability to perform the essential functions of her position, in particular during the months of October through December of 2018, were the central facts at issue in the RUDERMAN LAWSUIT.

131.    Dr. Shostak's records reflect that on every single visit since beginning treatment in 2008 (except one, in November of 2010), through October 23, 2018, Dr. Shostak prescribed RUDERMAN with Adderall for her ADD.

132.    However, when RUDERMAN was asked when she was diagnosed with ADD and responded that she takes Adderall, when asked next if she "still [has] ADD" she responded, "I don't know."

133.    Defendants herein knew or should have known this testimony was likely to be presented, knew same to be false and misleading, and intended to deceive the court and the Plaintiffs.

134.    Adderall is a controlled substance under New York State law requiring a doctor's prescription for a maximum of a 30-day supply, and prohibiting renewals without seeing the patient in person.

135.    Dr. Shostak's medication record shows that RUDERMAN was prescribed a 30-day supply of Adderall on October 23, 2018, and not again until February 5, 2019.

136.    RUDERMAN's 30-day supply as prescribed on October 23, 2018 would have therefore run out in late November, on or about November 22, 2018, if RUDERMAN was actually taking her medication.

137.    Unless she was not taking the medication in the first place, RUDERMAN would have been entirely without her ADD medication from late November, which is when she was diagnosed with LHON, until February 5, 2019.  If she had been taking her medication irregularly, such that she had some leftover from an earlier period that she was able to use between October 2018 and February 2019, that raises serious additional questions as to her ability to focus and thus perform the essential functions of her position even if she had been fully sighted.

138.    The fact that she was undergoing such emotionally challenging circumstances of her sudden vision loss only exacerbated her diminished ability to focus.

139.    Indeed, Dr. Shostak noted as of February 5, 2019, Plaintiff could not perform any of her daily functions without assistance.

140.    The complete psychiatric record, first seen by the defense at trial, showed RUDERMAN's long history of depression, anxiety and learning disabilities which she lied about at deposition and at trial.

141.    By concealing Dr. Shostak's records, Defendants herein committed intentional deceit, colluded with and consented to RUDERMAN's intentional deceit

142.    Having obtained many of the records described herein during trial, the defense in the RUDERMAN LAWSUIT only first saw the names of various doctors and other providers at

this time, and were thereby prevented from even requesting discovery of their records at any time pre-trial.

143.    RUDERMAN also had neuropsychological testing by Dr. Rima Danov.    Dr. Danov's report was in Dr. Shostak's records, and she relied on it.

144.    Dr. Danov's records provide information about RUDERMAN's learning disabilities and how they are exacerbated by stress.  This information was material to the question of what RUDERMAN's disabilities even were.  PRAKHIN Defendants having been deprived of this information prevented the defense from raising the issue in the RUDERMAN LAWSUIT; moreover, knowledge of this information would have been indispensable in order for anyone to even attempt to make reasonable accommodations for RUDERMAN's visual deficits in addition to all other deficits.

145.    RUDERMAN never revealed her ADHD or other learning disabilities to PRAKHIN or PRAKHIN P.C..  This omission provides independent grounds for terminating her from employment.

146.    Notice of all of RUDERMAN's disabilities should have been disclosed to PRAKHIN Defendants.

147.    Discovery and use of this information, and all of the records withheld by RUDERMAN and her attorneys, would have changed the outcome of the trial.

148.    RUDERMAN claimed that she requested and was denied six different assistive devices.  However, she was never denied anything.  At the time of her separation from PRAKHIN P.C. RUDERMAN had all the accommodations she claims to have requested.

149.    RUDERMAN obtained and used all of the accommodations she requested. The PRAKHIN Defendants permitted her to use each of the accommodations she proposed. PRAKHIN Defendants are neither ophthalmologists nor psychiatrists.

150.    A law firm and attorney can do nothing but discuss any need for accommodation as proposed by an employee in conjunction with their consultation with their doctor(s).

151.    RUDERMAN testified that she asked for reimbursement for the items she obtained. However, not once did she submit a single receipt for any of her purchases. Indeed, RUDERMAN's March 16, 2019, sworn EEOC charge proudly stated, "[n]ot once did I ask the Firm to foot the bill as I explored new accommodations that would make working with LHON easier for me."

152.    RUDERMAN and her attorneys intentionally withheld evidence, some which has still never been produced, and much of which was produced *by the witnesses at trial, not by* RUDERMAN's attorneys.

153.    PRAKHIN Defendants only learned of the very existence of RUDERMAN having gone to various doctors and disability providers from the records that were only first produced at trial, and those were from enforcing PRAKHIN Defendants' subpoenas, not because of RUDERMAN's production.

154.    Upon further requests for HIPAA authorizations by counsel for PRAKHIN Defendants, RUDERMAN's counsel's position, as set forth in an e-mail on August 11, 2020, was stated as being that disclosure of any/all documents that predated RUDERMAN's May 18, 2020 certification would be duplicative, as RUDERMAN certified that all such documents were fully produced, and therefore they would not provide HIPAA authorizations for such records.

21

155.    The Order by Magistrate Judge Mann early in the COVID pandemic, permitting RUDERMAN to obtain her own records and simply provide a certification that she had done so was an unusual solution to challenging times. The Court's flexibility and trust was responded to with deceit. These circumstances do not relieve attorneys of their ethical and legal obligations.

156.    This case had a truly unique situation which facilitated the fraud due to COVID. Because the discovery conference before the Magistrate occurred at the beginning of COVID when many offices were totally closed and others operating on skeleton staffs, the Magistrate ordered that RUDERMAN would obtain and provide her own medical records and then certify they were all provided. With an honest RUDERMAN and her counsel, this would not have been a problem.

157.    RUDERMAN's attorneys took this as a license to withhold documents, not to inform defense counsel of the existence of critical records, and to provide improper or partial records—all while certifying under oath that all documents were provided. It is a blatant abuse of the system.

158.    RUDERMAN's attorneys also falsely claimed that Defendants' prior counsel came to some agreement with Plaintiff's counsel that there was no need to produce pre-2018 documents. This claim was repeated but counsel produced no such agreement, and it was expressly rebutted by Defendant's prior attorney.

159.    RUDERMAN testified that she applied to the New York State Commission for the Blind in December 2018 which is amongst the information that the defense had the right to, but for RUDERMAN's outright deception.

160.    RUDERMAN committed perjury about the key facts on liability and damages. She lied about being able to perform a variety of the essential functions of the job AND lied about critical damages facts.

Case 1:25-cv-05911-CBA-SDE    Document 9-1    Filed 10/08/25    Page 26 of 39 PageID
#: 108

161.    RUDERMAN falsely testified that she had no vision problems before the onset of

her LHON in 2018, when in truth she was functionally blind in her left eye since childhood—a

condition which, when considered alongside her documented psychological impairments,

constituted a disability that should have been disclosed during litigation and trial.

162.    RUDERMAN's attorneys offered perjured testimony that she had no contributory

mental history before she was fired by PRAKHIN in 2018 when, as first learned from the withheld

psychiatric records on the *next to last day of trial*, she had a long history of at least 10 years of

treatment for anxiety, depression and learning disabilities (hidden in the 121 pages of psych records

first seen that next to last day of trial).

163.    RUDERMAN and her attorneys schemed to create a new entirely false narrative by

changing therapists, lying to her new therapist, Dr. Falk, and falsely told him that she had no psych

history prior to her LHON and termination from PRAKHIN P.C. in the fall of 2018.  RUDERMAN

also falsely told him that her prior psychiatrist (Dr. Shostak) diagnosed her with PTSD which Falk

then adopted.  When counsel for RUDERMAN stated they would not call Dr. Shostak as a witness,

defense counsel subpoenaed her.   Her testimony and records show she never diagnosed

RUDERMAN with PTSD.

164.    This scheme was intended to provide the jury with an entirely fake narrative,

erasing over a decade of treatment for anxiety and depression and Dr. Falk, RUDERMAN's only

emotional injuries witness, would be her mouthpiece for this fabricated narrative. He testified

based on the lies he was provided, stating the prior to the fall of 2018 with the onset of LHON and

her termination, she had no psychiatric history, and developed PTSD due to her termination.

Having only produced 10 pages of her psychiatrist, Dr. Shostak's records in discovery, when Dr.

Shostak was subpoenaed to testify and bring her records (actually 121 pages over 10 years), her

23

records revealed that when RUDERMAN first went to her in 2008, and *at that time* was already under treatment of another psychiatrist, all of which was hidden until the subpoena was enforced and it was learned on the next to last day of trial.

165.    RUDERMAN and her attorneys engaged in a four-year scheme to defraud the Court, changing her providers so that Dr. Falk could testify to the fraudulent psychiatric history RUDERMAN told him. RUDERMAN began seeing Dr. Falk in 2019 and fed him the misinformation of no prior psychiatric problems and a fake PTSD diagnosis. She continued to see Dr. Falk though the time of trial in 2023, having dozens of treatment sessions for four years and then had Falk testify *to what Plaintiff knew was a fabricated history*. This was a deliberate and calculated four-year fraud in the making

166.    Although RUDERMAN certified that she had produced all responsive mental-health records, only a fraction of treating psychiatrist Dr. Anna Shostak's file was produced pre-trial. Immediately before Dr. Shostak testified, approximately 100 handwritten pages were first produced in court after judicial inquiry into the completeness of Plaintiff's production.

167.    Defendants herein knew RUDERMAN's earlier certifications were false yet persisted, intending to mislead the Court and prejudice the defense.

168.    Defendants herein failed to produce in discovery RUDERMAN's personal cell-phone records, requested to corroborate extensive non-work usage in violation of firm policy, and against specific instruction and prior warning by PRAKHIN.

169.    Despite court involvement and subpoena, RUDERMAN's counsel withheld or opposed production of these records while permitting her false certification to stand.

170.    The withheld records were material to liability issues, to RUDERMAN's credibility, and to damages; their non-production proximately increased the PRAKHIN

Case 1:25-cv-05911-CBA-SDE    Document 9-1    Filed 10/08/25    Page 28 of 39 PageID #: 306

Defendants' defense costs and caused trial prejudice, and was undertaken with the intent to deceive the Court and the PRAKHIN Defendants (or, at minimum, with willful blindness).

171.    During trial, when the judge asked HUOT whether they had possession of certain medical records, HUOT initially responded, "I don't know," only to produce them when the judge pressed further. These records were produced with handwritten notations, clearly evincing an attempt to mislead both the Court and the defense.

172.    Defendants herein knew the facts referenced herein and acted with the intent to deceive the Court and the Plaintiffs (or at minimum with willful blindness), and such deceit was material and proximately caused Plaintiffs' damages.

173.    Unbeknownst to the PRAKHIN Defendants during the EDNY trial, in 2019— approximately two months before filing the federal case against them— RUDERMAN testified at her own examination before trial ("EBT") in *Kovalenko v. Ruderman*, (Kings Supreme Court, Index No. 517998/2017) that she could not see a photo exhibit because of her vision impairment. Notwithstanding that admission, in the federal action against PRAKHIN, she advanced wage-loss/back pay claims while simultaneously asserting unimpaired professional capacity and the ability to perform the essential functions of her position, including handling EBTs. Defendants knew and intended to advance these irreconcilable positions to inflate damages and deceive the Court and the Prakhin Defendants (or, at minimum, acted with willful blindness).

174.    After a 9-day jury trial, verdict was rendered in favor of RUDERMAN, and damages were awarded in an amount of $1,735,000, not including attorneys fees and costs which remained to be calculated. The verdict was upheld following a post-trial motion.

175.    RUDERMAN's attorneys made an application to the Court seeking attorneys' fees and costs exceeding $3.3 million.  By their application, HUOT attempted to collect attorney's fees for an <u>unadmitted</u> attorney.

176.    On October 31, 2024 PRAKHIN Defendants settled RUDERMAN's claims for $3 million, inclusive of attorneys' fees and costs.

## CAUSE OF ACTION

### Violation of JUDICIARY LAW 487

177.    Plaintiffs repeat and reiterate all of the foregoing allegations.

178.    Defendants herein acted as RUDERMAN's attorneys in the RUDERMAN LAWSUIT and at all times herein mentioned Defendants had the opportunity and the ability to reverse course and correct for their failures and comply with their ethical and legal obligations.

179.    Defendants, acting as attorneys in a pending judicial proceeding, engaged in intentional deceit in violation of Judiciary Law § 487.  After certifying discovery compliance under FRCP 26(g) and 11, Defendants deliberately "dumped" previously withheld medical records from Dr. Shostak and Dr. Falk—records that were material to Plaintiff's claims and defenses. This late production, occurring after certification and in violation of disclosure obligations under FRCP 26(a), 26(e), 33, and 34, was calculated to obstruct fair adjudication and mislead opposing counsel and the Court.

180.    Defendants knowingly and falsely represented that Plaintiff's prior attorney had agreed not to submit medical records predating the onset of LHON, despite no such agreement existing. This misrepresentation directly impacted the scope of evidence presented, prejudiced Plaintiff's ability to rebut causation and damages arguments, and constituted a deliberate attempt to manipulate the record. These acts of deception were committed knowingly, with intent to gain

26

FILED: RICHMOND COUNTY CLERK 10/07/2025 03:15 PM
NYSCEF DOC. NO. 1

Case 1:25-cv-05911-CBA-SDE    Document 1-1    Filed 10/08/25
#:137

INDEX NO. 152459/2025
Page 30 of 39 PageID
RECEIVED NYSCEF: 10/07/2025

an unfair advantage, and caused substantial harm to Plaintiff, thereby satisfying the elements of a
Judiciary Law § 487 claim.

181.    When RUDERMAN was asked: "What happened to your eyesight in September
2018?" she answered: "It slowly started to deteriorate.  It started in one eye and spread to the next.
It became blurry.  Within months I became legally blind." This answer was dishonest. She in fact
had significant vision loss in her left eye from a very early age due to amblyopia, AKA Lazy Eye.

182.    At her first visit in September 2018, her visual acuity in the left eye was reported
at 20/800. The condition she was eventually diagnosed with, LHON affected both eyes, but she
was not using her left eye prior to the onset of LHON. With such different acuities she did not have
binocular vision. Repeated references were made in the eye medical reports to the fact that she
functioned with monocular vision prior to the onset of LHON.   The ability to see small details of
the surroundings, judge distances, recognize faces of subjects, or verify descriptions in testimony
(in the case of Kovalenko v. Ruderman), as well as the testimony of her ophthalmologist.

183.    At trial, RUDERMAN falsely testified that she had no vision problems before the
LHON onset in 2018, even though she had long-standing monocular vision (functionally blind in
her left eye since childhood). Because Plaintiff's ADA claims and damages placed her visual
condition, qualification to perform essential functions, and causation of damages squarely at issue,
RUDERMAN and her counsel were required under the Federal Rules of Civil Procedure—
including Rules 26(a), 26(b)(1), 26(e), 33, and 34, and counsel's certifications under Rules 26(g)
and 11—to disclose and not misrepresent material facts and to produce responsive medical records.
Their contrary testimony and selective production constituted intentional deception during a

pending proceeding, in violation of Judiciary Law § 487 and the duties of candor and fairness owed to the Court and to Plaintiffs.

184.    On May 13, 2019, RUDERMAN gave a deposition pertaining to an accident she was involved in on May 15, 2017. She stated she had a valid driver's license with no restrictions at the time of the accident but did not reveal that she was functioning with only one eye.   She could not see to answer questions about a screen shot of the Google Map of where the accident took place, indicating that she had "difficulty seeing it" and that she had "an eye condition currently".

185.    With RUDERMAN's central vision loss and 20/250 acuity in her "good" right eye, she relied upon her "good" right eye to complete reading tasks prior to the more recent onset of vision loss. Even with the several low vision aids and assistive technologies she tried, the fact that she was no longer able to read effectively is illustrative of her inability to perform the essential functions of her job.

186.    In two months, late September to late November, 2018, RUDERMAN went from 20/20 vision to 20/250 in the right eye and her left eye deteriorated from 20/800 to Count fingers at 1 ft., therefore she was found legally blind (which is when a person has worse than 20/200 acuity in the best eye with best correction).

187.    All of the facts in this matter prove that in and around September 2018, RUDERMAN developed severe vision loss, and within a two-month period, she was legally blind due to LHON with a paracentral scotoma impacting her central vision; this severely inhibited her ability to read, see details in photos or videos, and perform the essential functions of a personal injury attorney, with or without accommodations.

28

FILED: RICHMOND COUNTY CLERK 10/07/2025 03:15 PM
NYSCEF DOC. NO. 1

INDEX NO. 152459/2025
RECEIVED NYSCEF: 10/07/2025

Case 1:25-cv-05911-CBA-SDE    Document 9-1    Filed 10/08/25    Page 32 of 39 PageID
#:409

188.    RUDERMAN further testified under oath at her deposition in *Kovalenko v. Ruderman* that she had an "eye condition" at that time, but did not have an "eye condition" at the time of her accident (2017).

189.    During trial, RUDERMAN admitted under oath that she was unable to read handwritten text. Nevertheless, she falsely claimed that she was capable of performing essential duties in Plaintiff's law office, which routinely require reading handwritten medical records, leases, and case notes. This contradiction was a deliberate attempt to mislead the Court regarding her qualifications and functional capacity.

190.    RUDERMAN's medical records further confirmed significant color perception impairments. Despite this, RUDERMAN repeatedly asserted—both during litigation and at trial—that she could perform tasks requiring accurate color recognition, including identifying traffic lights, vehicle colors, and other visual cues essential to office and fieldwork. These assertions were knowingly false and contradicted by objective medical evidence.

191.    RUDERMAN also testified that she could only see silhouettes and was unable to recognize faces. Yet she simultaneously insisted that she was capable of conducting EBTs and participating in courtroom proceedings—duties that inherently require the ability to perceive facial expressions, emotional cues, and visual reactions of witnesses, clients, and judges. Her inability to view a photo exhibit during her own deposition further underscores her lack of visual capacity during the period for which she claimed lost wages.

192.    These misrepresentations were not isolated errors but part of a coordinated effort, carried out with the knowledge, guidance, and approval of RUDERMAN's attorneys, to deceive the Court and opposing counsel. The false claims regarding her ability to perform essential job functions were made to support her demand for lost wages and back pay, despite overwhelming

29

FILED: RICHMOND COUNTY CLERK 10/07/2025 03:15 PM
NYSCEF DOC. NO. 1

INDEX NO. 152459/2025
RECEIVED NYSCEF: 10/07/2025

Case 1:25-cv-05911-CBA-SDE    Document 9-1    Filed 10/06/25    Page 33 of 39 PageID
#: 410

evidence to the contrary. This pattern of intentional deceit during a pending judicial proceeding constitutes a clear violation of Judiciary Law § 487, which prohibits attorneys from engaging in or facilitating fraudulent conduct designed to mislead the Court or any party to the litigation.

193. Defendants herein commenced and prosecuted a frivolous claim against PRAKHIN Defendants. The mere fact that they successfully duped a jury and misled a federal judge does not change this fact.

194. The Judge determined that RUDERMAN could have other people read such documents for her as an accommodation. This was an error of law, as it is not for the Court to modify the essential function of a job. RUDERMAN was required to be able to perform *all* the essential functions of her job – not merely *some*—or *most* of her functions. *Jacobs v. NC Administrative Office of the Courts*, 780 F.3d 562, 581 (4th Cir, 2015). And a Court must defer "to an employer's judgment regarding what functions are essential for service in a particular position." *Shannon v New York City Tr. Auth.*, 332 F3d 95 (2d Cir., 2003).

195. A plaintiff must demonstrate that they are "able to perform all of the essential functions of the position." *Feliciano v. State of RI*, 160 F. 3d 780 (1st Cir. 1998)

196. "An employee is deemed qualified only if she can perform all of the essential functions of her job, whether accommodated or not. 42 U.S.C. § 12111(8)." *Williams v. AT&T Mobility Services LLC,* 847 F. 3d 384, 391 (6th Cir. 2017).

197. A "reasonable accommodation can never involve the elimination of an essential function of a job." *McMillan v. City of New York,* 711 F. 3d 120 (2d Cir. 2013).

198. The Judge's determination here is also factually flawed in that it would require the presence of a second employee (reader) to accompany RUDERMAN to depositions and to Court every day.

30

199.    The Judge's determination here even contradicts RUDERMAN's witnesses including former managing attorney, Irene Gabo, who testified that while paralegals often review medical records in a plaintiff's personal injury firm for purposes of preparing a Bill of Particulars, on several occasions she saw errors in the work of the paralegal and it is the job of the handling attorney, like RUDERMAN, to review the medical records and ensure that the final product is correct.

200.    Plaintiff demonstrated at trial that she was unable to read handwritten documents even with her own chosen adaptive device.  Therefore, PRAKHIN Defendants' alleged failure to provide some unknown device should have been considered irrelevant.

201.    The verdict, post-verdict motion decision, and ultimate settlement of the action was effectively compelled by the deception of the Defendants herein.

191.    Defendants engaged in a persistent pattern of unethical and illegal behavior, at and prior to trial.

192.    Failure by the Defendants to provide the discovery discussed herein was intentional.

193.    Defendants' above-described discovery and ethical failures at and prior to trial constitute a chronic, extreme pattern of legal delinquency.

194.    By all of the above, Defendants committed these acts and omissions wantonly, in reckless and/or callous disregard of, and/or with indifference to, the rights of the Plaintiffs herein.

195.    An inference of Defendants' knowledge of these facts arises due to Defendants' deliberately avoiding learning them thereby evading their legal responsibilities.

196.    Based on the above, the doctrine of willful blindness, also known as deliberate ignorance, applies.

197. By all of the above, Defendants intentionally deceived Plaintiffs herein.

198. Based on all of the above, Defendants have violated Judiciary Law § 487.

199. Because of the Defendants' intentional deceit, consent to RUDERMAN's deceit, and willful blindness, Plaintiffs have been prejudiced by the passage of time, in that the facts and circumstances surrounding the above-described acts and omissions of the Defendants may have been obscured and Plaintiffs have been placed in a position where they may not be able to develop evidence or fully explore and set forth acts of negligence of those responsible for Plaintiffs' injuries and other damages sustained arising out of the RUDERMAN lawsuit and Defendants' representation of Plaintiffs in connection therewith.

200. The Defendants' intentional deceit, consent to RUDERMAN's deceit, and willful blindness, was a proximate cause of the damages sustained by Plaintiffs as described above.

201. Plaintiffs herein are therefore entitled to treble damages as provided for under Judiciary Law § 487.

WHEREFORE, Plaintiffs respectfully request that judgment be entered against Defendants, jointly and severally, awarding disgorgement and return of all legal fees collected by Defendants, and waiver/forfeiture of all amounts not collected, compensatory damages to Plaintiffs in an amount to be determined at trial, and treble damages pursuant to Judiciary Law 487, in addition to interest, at the legal rate, from February 27, 2020 until the date of judgment herein, and

32

awarding such other relief as the Court deems just and proper, including attorneys' fees and the

costs and disbursements of this action.

Dated:      Brooklyn, New York
            October 7, 2025

                                        _____
                                        YURIY PRAKHIN, ESQ.
                                        LAW OFFICE OF YURIY PRAKHIN, PC
                                        1883 86th Street, 2nd Floor
                                        Brooklyn, NY 11214
                                        (718) 946-5099

**33**

## VERIFICATION

The undersigned, an attorney admitted to practice in the Courts of the State of New York, hereby affirms the following to be true under the penalties of perjury:

I, **YURIY PRAKHIN,** am a Plaintiff in the action herein, and I have read the foregoing COMPLAINT on my own behalf and on behalf of LAW OFFICE OF YURIY PRAKHIN, P.C., and as such know the contents thereof; that the same is true to my own knowledge, except as to those matters therein stated to be alleged upon information and belief, and that as to those matters, your affirmant believes it to be true.

Pursuant to CPLR § 2106, I affirm this 7th day of October, 2025, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that said document will be filed in an action or proceeding in a court of law.

Dated:     Brooklyn, New York
           October 7, 2025

YURIY PRAKHIN, ESQ.
LAW OFFICE OF YURIY PRAKHIN, PC
1883 86th Street, 2nd Floor
Brooklyn, NY 11214
(718) 946-5099

Case 1:25-cv-05911-CBA-SDE   Document 9-1   Filed 10/08/25   Page 38 of 39 PageID #: 146



Form 2 - AFFIDAVIT OF SERVICE

P25231823

**YURIY PRAKHIN P.C.**
SUPREME COURT RICHMOND COUNTY STATE OF NEW YORK

LAW OFFICE OF YURIY PRAKHIN, P.C., AND YURIY PRAKHIN, ESQ.
PLAINTIFF

- vs -

FARUQI & FARUQI, LLP, ETAL
DEFENDANT

Index No. **152459/2025**
Date Filed
Office No. **40758**
Court Date.

STATE OF **NEW YORK**, COUNTY OF **NEW YORK**     :SS:

**FREDDI SIMON** being duly sworn, deposes and says; I am over 18 years of age, not a party to this action, and reside in the State of New York. That on the **14TH** day of **OCTOBER 2025, 1:02PM** at
**C/O FARUQI & FARUQI, LLP**
**685 THIRD AVENUE**
**26TH FLOOR**
**NEW YORK NY 10017**
I served the **ATTORNEY'S VERIFICATION, NOTICE OF ELECTRONIC FILING, NYSCEF CONFIRMATION NOTICE, SUMMONS AND VERIFIED COMPLAINT** upon **INNESSA MELAMED HUOT, the DEFENDANT**, therein named by delivering and leaving a true copy or copies of the aforementioned documents with **BRYAN (DOE) (REFUSED FULL NAME), RECEPTIONIST,** a person of suitable age and discretion.

Deponent describes the person served as aforesaid to the best of deponent's ability at the time and circumstances of the service as follows:

GENDER: **MALE**   PERCEIVED RACE: **WHITE** HAIR: **BALD**

APP.AGE: **35-45** APP. HT: **5ft8in**     APP. WT: **180**

OTHER IDENTIFYING FEATURES

On **10/15/2025** I deposited in the United States mail another true copy of the aforementioned documents properly enclosed and sealed in a post-paid wrapper addressed to the said **DEFENDANT** at the above address. That being **the place of business of the DEFENDANT.**

Copy mailed 1st class mail marked personal and confidential not indicating on the outside thereof by return address or otherwise that said notice is from an attorney or concerns an action against the person to be served.

**COMMENTS: SERVER GPS DATA: COMPLETION - 10/14/2025 - 1:02 PM - 40.751913888889, -73.973188888889**

That at the time of service, as aforesaid, I asked the **person spoken to** whether the DEFENDANT was in the military service of the United States Government, or of the State of New York, and received a negative reply. Upon information and belief based upon the conversation and observation as aforesaid I aver that the **DEFENDANT** is not in the military service, and is not dependent on anyone in the military service of the United States Government or the State of New York, as that term is defined in statutes of the State of New York, or of the Federal Soldiers and Sailors Civilian Relief Act.

Sworn to before me this
15TH day of OCTOBER, 2025

SELENA INES ADAMES
Notary Public, State of New York
No. 01AD6365042
Qualified in QUEENS COUNTY
Commission Expires 09/25/2029

FREDDI SIMON #2120081-DCWP
Lexitas - DCWP #2098109 #2098109-DCA
1235 BROADWAY 2ND FLOOR
NEW YORK, NY 10001
Reference No: 3-YP-25231823

Case 1:25-cv-05911-CBA-SDE    Document 9-1    Filed 10/06/25    Page 39 of 39 PageID
#: 176



Form 2 - AFFIDAVIT OF SERVICE

P25231799

**YURIY PRAKHIN P.C.**
SUPREME COURT RICHMOND COUNTY STATE OF NEW YORK
LAW OFFICE OF YURIY PRAKHIN, P.C., AND YURIY PRAKHIN, ESQ.

PLAINTIFF

- vs -

FARUQI & FARUQI, LLP, ETAL

DEFENDANT

Index No. **152459/2025**
Date Filed
Office No. **40758**
Court Date.

STATE OF **NEW YORK**, COUNTY OF **NEW YORK** :SS:

**FREDDI SIMON** being duly sworn, deposes and says; I am over 18 years of age, not a party to this action, and reside in the State of New York. That on the **14TH** day of **OCTOBER 2025, 1:02PM** at
**685 THIRD AVENUE**
**26TH FLOOR**
**NEW YORK NY 10017**
I served the **ATTORNEY'S VERIFICATION, NOTICE OF ELECTRONIC FILING, NYSCEF CONFIRMATION NOTICE, SUMMONS AND VERIFIED COMPLAINT** upon **FARUQI & FARUQI, LLP, the DEFENDANT**, therein named by delivering and leaving a true copy or copies of the aforementioned documents with **BRYAN (DOE) (REFUSED FULL NAME), RECEPTIONIST**, a person of suitable age and discretion.

Deponent describes the person served as aforesaid to the best of deponent's ability at the time and circumstances of the service as follows:

GENDER: **MALE**    PERCEIVED RACE: **WHITE** HAIR: **BALD**
APP.AGE: **35-45** APP. HT: **5ft8in**    APP. WT: **180**
OTHER IDENTIFYING FEATURES

On **10/15/2025** I deposited in the United States mail another true copy of the aforementioned documents properly enclosed and sealed in a post-paid wrapper addressed to the said **DEFENDANT** at the above address. That being **the place of business of the DEFENDANT**.

Copy mailed 1st class mail marked personal and confidential not indicating on the outside thereof by return address or otherwise that said notice is from an attorney or concerns an action against the person to be served.

**COMMENTS: SERVER GPS DATA: COMPLETION - 10/14/2025 - 1:02 PM - 40.751913888889, -73.973188888889**

That at the time of service, as aforesaid, I asked the **person spoken to** whether the DEFENDANT was in the military service of the United States Government, or of the State of New York, and received a negative reply. Upon information and belief based upon the conversation and observation as aforesaid I aver that the **DEFENDANT** is not in the military service, and is not dependent on anyone in the military service of the United States Government or of the State of New York, as that term is defined in statutes of the State of New York, or of the Federal Soldiers and Sailors Civilian Relief Act.

Sworn to before me this
15TH day of OCTOBER, 2025

SELENA INES ADAMES
Notary Public, State of New York
No. 01AD6365042
Qualified in QUEENS COUNTY
Commission Expires 09/25/2029

FREDDI SIMON #2120081-DCWP
Lexitas - DCWP #2098109 #2098109-DCA
1235 BROADWAY 2ND FLOOR
NEW YORK, NY 10001
Reference No: 3-YP-25231799

2a